AMARIAH A. TAFT *vs.* CLAUDIUS B. TRAVIS.

Worcester, Oct. 3. — Nov. 27, 1883. FIELD & W. ALLEN, JJ., absent.

The owner of a chattel requested A. to find a customer for it, but did not name a price for which he would sell it. A. agreed to sell it for a certain price to B., who agreed to pay for it, if it should prove satisfactory. Before B. accepted it, he met the owner, who said to B. that he did not wish B. to pay any one but himself for it; and B. said he would pay no one else until he saw the owner again. *Held,* in an action by the owner against B., for the value of the chattel, that these facts would warrant a finding that the parties assented to treat the chattel as sold at the time the interview took place; and, as no price was then named, that the plaintiff was entitled to recover what the chattel was fairly worth.

CONTRACT to recover $1000, the price of a steam-engine alleged to have been sold by the plaintiff to the defendant. Answer: 1. A general denial. 2. That on or about May 1, 1881, the defendant purchased a steam-engine of one Lafayette Huntoon for the sum of $300; and that said Huntoon represented himself to be the agent of the plaintiff. Trial in the Superior Court, before *Aldrich,* J., who allowed a bill of exceptions in substance as follows:

The plaintiff testified that he became the owner of the engine in question by bill of sale from Charles Hunt to him dated December 5, 1879; that he took possession of the engine soon afterwards at Natick, where it remained for more than a year; that he never gave Huntoon any authority to sell the engine further than was contained in the following letter; which was put in evidence:

"Milford, February 5, 1881.

"L. Huntoon, Esq. Dear Sir:

"If you can find a customer to purchase the engine now in your shop at Natick, I wish you would. I will sell for $100 cash

down and the balance on instalments monthly, if I cannot do any better. Please find a customer, and I will make it all right with you.

"Yours truly,

"A. A. Taft."

The plaintiff further testified as follows:

"I first became acquainted with the defendant early in April, 1881. I said to him that I understood he had an engine of mine at his shop. He said that Huntoon had put an engine in there on trial. I notified him that it was my engine, and that I did not wish him to pay any one for it but me. He said he had paid a few dollars for setting it up, but he would pay no more till he saw me. I saw the defendant in September, 1881, in Boston. I asked him how the engine was going. He said, 'Pretty well.' I said, 'Well, it's about time you paid me, isn't it?' He said he had paid Huntoon for it. I said, 'I told you the engine was mine, and I notified you not to pay any one else for it.' He said he had paid Huntoon, and he walked away. The defendant did not tell me how much he paid Huntoon. I have never received anything for the engine. It was worth $750."

On cross-examination, the plaintiff testified as follows: "C. H. Hunt was engaged in the manufacture of steam-engines at Natick for some time prior to 1879. He succeeded Huntoon in that business. He moved his business to South Boston in the fall of 1879. I lived in Milford all the time. I have known Huntoon fifteen to twenty years. He used to live in Milford. I have had frequent dealings with him. I lent him money in 1876, and took a mortgage from him on his engines, &c., and foreclosed it. C. H. Hunt bought the property at the sale, and then gave me a mortgage back upon the same. I never said anything to Huntoon about the price I would take for the engine. I first learned that the defendant had the engine in the last of April, 1881. I had no talk with Huntoon about putting the engine into the defendant's shop. When I saw the defendant in Boston, in April, I made no arrangement to see him again, and did not ask him to report to me how he liked the engine; nothing was said between us about the price.

"I received notice early in June, 1881, from Huntoon, that the engine was sold to C. B. Travis & Co. for $300."

Two other witnesses testified that the engine was worth from $800 to $1000. One Chamberlain, called by the plaintiff, testified to the conversation between the plaintiff and the defendant at the depot in Boston, in April or the fore part of May, in accordance with the account of it given by the plaintiff in his testimony. He also testified that the engine was new, and had not been run prior to the defendant's having it.

For the defendant there was testimony from three witnesses as to the condition of the engine and its previous use, but to nothing else.

The defendant testified as follows: " I am a boot and shoe manufacturer in Natick. I have known L. Huntoon for fifteen years. I never had any business transactions with him till this one. Huntoon put the engine into my shop on May 5, 1881. I met the plaintiff in Boston on May 8th or 10th, in the depot. He said to me, ' I understand that you have got my engine in your shop.' I said, ' Huntoon has put it in on trial, and you are the third person to claim it.' He said it was his engine, and he was glad I had it; that it had been idle a good while. He did not tell me not to pay any one but himself. This was my only interview with the plaintiff till the last of September. Huntoon showed me the letter of the plaintiff, dated February 5, before I moved the engine to my shop.

" About the middle of April, 1881, I had my first conversation with Huntoon about this engine. He said that he had an engine that he was agent to sell, on which he had performed labor, and which he had stored partly in his shop and partly in his woodshed. He said I could buy it for $300; that I could put it in and try it, and, if it suited, all right.

" He showed me the plaintiff's letter in the very last days of April, 1881, at my office, and said he had authority in writing to sell from everybody who claimed to own it. At last I told him he might put it in, and, if it proved satisfactory, I would pay the $300 for it. I notified him, May 28, 1881, that I would take it, and paid him the last of the $300 on the engine on that day. I had let him have money from time to time before that, while he was at work setting it up and getting it into running order, and took his borrowed and received for it. I had no talk with the plaintiff after the one in the first part of May till the last of

September or the first of October. We then met in Boston, and he asked how the engine was working. I said it was running fairly. He said, 'Then I suppose you are most ready to settle for it.' I said, 'Why, I paid your agent for it, which you had notice of.' He said he was no agent of his, no more than to sell his horse out of his barn. I said his authority was sufficient for me, and I paid my money in good faith. I never had any other talk with the plaintiff, and never received any notice from him."

The witness further testified that he accepted the engine on May 28; that he then gave Huntoon a due-bill for $300, which he paid as follows: June 13, $85; June 20, $65; June 30, $150.

The bill of sale was put in evidence. It was dated May 28, 1881, and was signed, " A. A. Taft, by L. Huntoon, Agent."

At the close of the evidence, the defendant asked the judge to instruct the jury as follows: " 1. There is no evidence to authorize the jury to find a verdict for the plaintiff. 2. There is no evidence to authorize the jury to find a sale of the engine in question directly by the plaintiff to the defendant. 3. If the jury find that Huntoon was authorized by the plaintiff to sell the engine, but that he was not authorized to receive pay therefor, and the defendant was notified by the plaintiff to pay therefor only to himself, and Huntoon sold the engine to the defendant for $300, then the plaintiff can recover only that sum in this suit. 4. To entitle the plaintiff to a verdict, on the theory of a direct sale by him to the defendant, the jury must find that the minds of the parties met as to the subject matter and the price; in other words, that there was an agreement between them as to the terms of the sale. 5. The retention of possession of the engine by the defendant, after a notification by the plaintiff to him, that if he bought it he must pay him, without anything ever being said between them as to the price, would not amount to a sale, and the plaintiff cannot recover. 6. If the plaintiff was notified by Huntoon of the sale of the engine to the defendant, soon after the same was made, it was his duty to disaffirm the act of Huntoon at once, and to notify the defendant thereof, and his delay for nearly four months in so notifying him would amount to a ratification of such sale by the plaintiff, and he cannot maintain this action. 7. If Huntoon sold, on May 28, 1881, the engine to the defendant, for $300, and the plaintiff was notified by

Huntoon, on or about June 1, 1881, of the sale to the defendant, and the price for which it was sold, and the plaintiff gave no notice of dissent to the defendant for nearly four months, his assent to the price will be presumed, and the plaintiff can only recover the price so agreed upon and notified, to wit, $300. 8. If Huntoon sold and delivered the engine to the defendant at an agreed price of $300, and received payment therefor, and at once notified the plaintiff of the same, and the plaintiff gave no notice of dissent or disaffirmance for four months, that would authorize the jury to find a ratification by the plaintiff of such sale and payment, even if he had, prior to said sale, notified the defendant to pay for the same only to himself. 9. If Huntoon was authorized by the plaintiff to sell the engine, and Huntoon sold it to the defendant for $300, which was a much less price than it was fairly worth, and in fraud of the rights of the plaintiff, the plaintiff can only recover in this action the sum of $300, because he cannot ratify a part only of the contract and disaffirm a part. 10. There is no evidence to authorize the jury to find for the plaintiff in a greater sum than $300, and interest."

The judge instructed the jury as to the plaintiff's ownership, and proceeded as follows : " The second question for you is, Had Huntoon authority, as the plaintiff's agent, to sell the engine to the defendant ? If he had, then the contract between Huntoon and the defendant would be the plaintiff's contract, and he would be bound by it. The first evidence bearing on this proposition is the letter of February 5. If there is nothing to modify that, and it was shown to the defendant, and he in perfect good faith made a contract with Huntoon for $300, that would bind the plaintiff. It would not only authorize Huntoon to agree upon the price, and sell the engine, but would also authorize him to receive at least the $100 named in the letter towards payment for it. But if, prior to the sale to the defendant, the plaintiff told the defendant to pay only himself for it, that would be a revocation of all authority to Huntoon to receive pay for the engine, but only to that extent. If Huntoon and the defendant, after the interview in Boston between the plaintiff and the defendant, proceeded to make a contract, and Huntoon, as the agent of the plaintiff, sold the engine to the defendant, and he purchased it from Huntoon as such agent, it would be a valid

contract binding upon the plaintiff, if there was no bad faith between them, — no combination in fraud of the plaintiff. But if the contract between Huntoon and the defendant was made to defraud the plaintiff, and the fraud was participated in by the defendant, that would taint the whole contract; and the contract made under such circumstances would not bind the plaintiff, nor affect his rights. But if the contract between Huntoon and the defendant was made in good faith, and the jury find that Huntoon's authority to receive payment had been revoked by what took place between the plaintiff and the defendant in Boston, then the plaintiff can only recover the contract price, namely, $300. But if the contract was in bad faith, and fraudulent as to the rights of the plaintiff, as already stated, then what is the measure of damages? If, after the engine was in the possession of the defendant, he saw the plaintiff, and was only notified to pay no one but the plaintiff for it, then the jury would be authorized to find that the plaintiff assented to the defendant's keeping the engine and treating it as his own. But if the contract between Huntoon and the defendant was rendered void by fraud, as before stated, then, there being no price fixed, the plaintiff would be entitled to recover what the engine was fairly worth at the time, if the jury find upon the evidence that there was either an express or implied contract of sale directly between the plaintiff and the defendant."

The judge refused to give the first, second, third, fifth, and tenth requests for instructions. The fourth request was given, except that the judge ruled that it was not necessary that any price should have been agreed upon to enable the plaintiff to recover on a *quantum meruit*.

As to the sixth request, the judge said: "If the contract between Huntoon and the defendant was made in good faith, and was not invalid by reason of fraud, then it was the duty of the plaintiff, upon being notified of the sale, to give notice of disaffirmance at once, and if he delayed for four months, that would be evidence of a ratification of the sale by him; and if the plaintiff did not give the defendant notice to pay no one for the engine but the plaintiff himself, until after the defendant had paid Huntoon the $100, which the latter was, by the letter of the plaintiff of February 5, authorized, upon a sale of the engine, to

receive, then all the plaintiff can in any event recover in this action is the sum of $200, the difference between $100 and the contract price of $300. But if the sale was fraudulent, in the way I have indicated, and the fraud was participated in by the defendant, then the failure to disaffirm, or give notice of dissent, would have no application, and would not in any respect affect the plaintiff's right to recover the fair value of the engine."

As to the seventh request, the judge gave it with the same modification, as to good faith and fraud, as in his previous instructions; and added, that, if the sale by Huntoon was fraudulent, in the way indicated, and was participated in by the defendant, the neglect by the plaintiff to notify the defendant of his dissent would not affect the plaintiff's right to recover the fair value of the engine.

As to the eighth request, it was given with the same modification, as to good faith and fraud, as far as the words "even if," &c., which portion, including all after said words, the judge declined to give, and made the same addition as was made in the previous instructions.

As to the ninth request, the judge said: "If this request is made on the assumption that the defendant did not participate in the fraud of Huntoon, then I instruct you in accordance with the request; but if it is made on the assumption that he did participate in the fraud of Huntoon, then I decline to give it."

The jury found for the plaintiff in the sum of $704; and the defendant alleged exceptions.

*F. A. Gaskill & S. L. Powers*, for the defendant.

*T. G. Kent*, (*H. E. Fales* with him,) for the plaintiff.

C. ALLEN, J.   There was some evidence tending to show that the plaintiff, being the owner of the engine, met the defendant, at a time when the latter had it in his possession either rightfully or wrongfully, and gave notice of his ownership, and that he, the plaintiff, did not wish the defendant to pay any one for it but himself; that the defendant did not dissent therefrom, and said he had paid a few dollars for setting it up, but would pay no more till he saw the plaintiff; that the engine accordingly remained in the possession of the defendant, with no offer on his part to give it up; and that nothing was thereafter done or said by him to modify the inferences which might be drawn

from what had gone before. This, if believed by the jury to be the true state of the case, would warrant them in finding that both parties assented to treating the engine as then sold by the plaintiff to the defendant, for a reasonable price, not fixed. If the defendant did not wish to keep it on these terms, he might have said so. An assent to a sale need not be in express terms; and it is not necessary that a price be fixed by the parties. If no price is fixed, the law implies that it is what the article is reasonably worth. *Acebal* v. *Levy*, 10 Bing. 376. *Hoadly* v. *M'Laine*, 10 Bing. 482. *Valpy* v. *Gibson*, 4 C. B. 837. Benjamin on Sales (4th Am. ed. by Corbin) 52, 102, 270–272.

As to the amount of damages, the verdict may stand, upon the ground that the plaintiff repudiated what Huntoon had done, and that the transaction between the plaintiff and the defendant alone constituted the sale.                    *Exceptions overruled.*